UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAWN C. HACKETT, | ) | CASE NO. 5:13CV2014 |
| Plaintiff, | ) ) | JUDGE DONALD C. NUGENT |
| v. | ) ) | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN,[1] ACTING COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) ) | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. | ) | |

Dawn C. Hackett ("Plaintiff"), acting *pro se*, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #3. ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

**I.**     **PROCEDURAL AND FACTUAL HISTORY**

On December 14, 2008 and January 12, 2009, Plaintiff applied for DIB and SSI benefits alleging disability beginning on August 10, 2007. Transcript ("Tr.") at 167-180.[2] Plaintiff's date last insured is December 31, 2008. Tr. at 172. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 86-136. Plaintiff requested an administrative hearing, and on September 2, 2011, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

was represented by counsel. Tr. at 44-85. On December 2, 2011, the ALJ issued the Decision denying benefits. Tr. at 26-43. Plaintiff filed a request for review, which was denied by the Appeals Council on June 20, 2012. Tr. at 1-7.

On March 26, 2013, Plaintiff filed the instant suit seeking review of the Decision in the United States District Court for the Eastern District of Virginia. ECF Dkt. #1. On July 16, 2013, pursuant to a standing order issued by the Eastern District of Virginia, Plaintiff filed a brief on the merits, captioned "Additional Evidence /Proof of My Disability and Note to U.S.D.A." ECF Dkt. #10. On September 5, 2013, with leave of Court, Defendant filed a motion for summary judgment and memorandum in support. ECF Dkt. #13. A day later, on September 6, 2013, Plaintiff, now a resident of Akron, Ohio, filed a motion for a change of venue, ECF Dkt. #15, which the Court granted on September 11, 2013, thereby transferring this case to the Northern District of Ohio. ECF Dkt. #16.

**II.** **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-five years of age on her alleged disability date and forty-eight years of age on the date of the hearing, suffered from multiple sclerosis ("MS"), degenerative disk disease, and osteoarthritis, which qualified as a severe impairment under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 28. The ALJ characterized Plaintiff's impaired vision ( which is improved with corrective lenses or contacts), migraines, and foot and ankle fractures, irritable bowel syndrome, and gastroesophageal reflux disease, and depression and anxiety as non-severe impairments. Tr. at 29-30. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. ("Listings").

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of sedentary work, including her past relevant work as a human resources analyst. Tr. at 31, 36. Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out

job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a). As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     ANALYSIS

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that she is capable of a full range of sedentary work, including her past work as a human resources analyst. More specifically, Plaintiff argues that the ALJ did not give any weight to the opinion of Steven W. Noles, Psy.D. because he did not examine Plaintiff, but, in fact, correspondence attached to her merits brief shows that Dr. Noles met with Plaintiff. Plaintiff also relies on the medical tests in the record to show that she suffers from MS, degenerative disk disease, osteoarthritis, and a number of other medical problems. Finally, she relies upon her own testimony at the hearing to demonstrate that she suffers debilitating pain and concentration problems, which prevent her from performing full-time work.

### A.     Medical history

With respect to Plaintiff's physical impairments, she was diagnosed with MS in August of 2007, when an MRI of the brain revealed findings representative of a demyelinating disease. Tr.

629-30. The following year, on July 18, 2008, Dr. Islam Zaydan, M.D., a neurologist at the Virginia Commonwealth University ("VCU") Department of Neuro-Ophthalmology, arranged for Plaintiff to undergo an MRI of the lumbar spine for further evaluation. Tr. 427-28. The MRI showed an increased signal within the spinal cord that the radiologist concluded could be consistent with multiple sclerosis. Tr. 428. An MRI of the head on April 30, 2010, showed hyperintensity in the mid pons, increased since the MRI on August 31, 2007, which, with a history of optic neuritis, was considered consistent with multiple sclerosis. Tr. 518. One year later, a May 18, 2011 MRI of the head, showed no change in hyperintensity, but findings consistent with a demyelinating process. Tr. 560.

As a symptom of her multiple sclerosis, Plaintiff reported diminished vision when she did not wear her glasses or contact lenses. Tr. 363. Visual testing on July 8, 2008, however, showed improved vision with corrective lenses. Tr. 363. An examination on February 18, 2011, by June R. Tunstall, M.D., Plaintiff's general practice physician, revealed grossly intact peripheral vision and visual acuity. Tr. 580.

Treatment notes from Dr. Zaydan on May 12, 2009, show that Plaintiff used a cane for balance, due to episodes of instability in her legs, but her motor strength and tone were normal. Tr. 441.

In addition to treatment for symptoms related to multiple sclerosis, Plaintiff has a history of treatment for degenerative disc disease and back pain radiating into her legs. Tr. 426. An MRI of the cervical spine on October 16, 2007, revealed degenerative changes at the lower cervical spine, but no evidence of demyelinating cord lesion. Tr. 429-30. MRI scans of the lumbar spine on July 18, 2008, Tr. 427-28, and April 30, 2010, showed degenerative disc disease with a disc bulge at L5-S1 with interval progression, but no evidence of spinal stenosis or disc herniation. Tr. 519.

In February 2009, an examination by John D. Ward, M.D., a neurosurgeon at VCU Health System, showed that Plaintiff's gait and station were stiff, but she walked without a limp. Tr. 438. Muscle testing of her lower extremities showed good strength. Tr. 438. Dr. Ward prescribed a muscle relaxant and epidural steroid injections, Tr. 437-38, which Plaintiff underwent in March 2009. Tr. 426.

Dr. Ward referred Plaintiff to Bruce Mathern, M.D., for a neurosurgical evaluation on April 16, 2009. Tr. 432-34. The evaluation revealed limited cervical and lumbar range of motion, but intact sensation, negative straight leg-raising, no evidence of pathological reflexes, and full strength at five on a scale of one to five. Tr. 433. Dr. Mathern diagnosed Plaintiff with mechanical low back pain and lumbar radiculopathy. Tr. 433. He advised against lumbar fusion surgery for the type of degenerative changes that Plaintiff exhibited given that it would only be appropriate if her quality of life had deteriorated such that she was unable to tolerate her symptoms. Tr. 433. He noted, however, that she was a full-time student and a caregiver for her mother. Tr. 433. At a return visit on May 14, 2009, Dr. Mathern again discussed with Plaintiff the risks and benefits of surgery, noting that her multiple sclerosis complicated her care. Tr. 556.

Plaintiff underwent a CT scan of the cervical spine on August 16, 2009, which confirmed multilevel degenerative changes. Tr. 610. An MRI of the lumbar spine on April 30, 2010, showed moderate degenerative disc disease at L5-S1 with interval progression, but no evidence of spinal stenosis or disc herniation. Tr. 619. Subsequent treatment with Dr. Tunstall in February and July of 2011 showed that despite her complaints, Plaintiff's general appearance was healthy and she walked normally. Tr. 571, 580.

John Hennessey, IV, M.D., performed a consultative examination of Plaintiff on August 30, 2010. Tr. 521-27. He noted that she was fluent, articulate, and upbeat. Tr. 523. Plaintiff had motor weakness in her extremities, but full range of motion. Tr. 523, 527. A neurologic examination showed a mild degree of optic nerve pallor and a subtle afferent pupillary defect on the left. Tr. 524.

Dr. Tunstall completed an undated form to assess Plaintiff's ability to perform work-related physical activities. Tr. 566-68. Dr. Tunstall concluded that Plaintiff had no restrictions in lifting; could stand and/or walk for fifteen to twenty minutes without interruption and for a total of one hour in an eight-hour day; and could sit for two hours without interruption and for a total of eight hours. Tr. 567-68.

Turning to Plaintiff's mental impairments, from 2004 to 2009, Plaintiff underwent outpatient mental health treatment for anxiety and depression at Chesterfield Community Services Board. Tr.

383-422. Treatment records from September 2007 through February 2009 indicate that her depression and anxiety were stable on her treatment regimen. Tr. 394-402.

Linda Dougherty, Ph.D., a licensed clinical psychologist, performed a consultative examination of Plaintiff on June 8, 2009. Tr. 445-50. Plaintiff reported no short-term memory and diminished long-term memory. Tr. 445. She had been a full-time caregiver for her mother since 2003 and was currently a third-year student at the University. Tr. 446. Plaintiff was independent in her daily activities and prepared breakfast for her mother each morning before leaving to attend classes. Tr. 446. A mental status evaluation revealed that her mood was congruent to the situation, but she reported that she felt sad. Tr. 447. She demonstrated average attention, but impaired memory. Tr. 447.

Dr. Dougherty concluded that Plaintiff's credibility was variable, noting discrepancies between Plaintiff's reported memory deficiencies and her ability to attend college full-time, and between Plaintiff's denial of substance use and mental health records that documented past rehabilitation for crack cocaine and marijuana use. Tr. 448. Dr. Dougherty diagnosed Plaintiff with major depressive disorder, recurrent, moderate, and generalized anxiety disorder. Tr. 448. She concluded that Plaintiff would be able to perform both simple, repetitive tasks and moderately complex, detailed tasks. Tr. 449. She opined that Plaintiff would likely be able to maintain regular attendance and complete a normal workday, but would need additional supervision to complete work activities on a consistent basis due to depression and anxiety. Tr. 449. In June of 2009, state agency medical consultant, Juan Astruc concluded that Plaintiff was capable of light work, except that she must never climb ropes or scaffolding. Tr. at 451-457.

Gerald R. Showalter, Psy.D., a licensed clinical psychologist at the Woodrow Wilson Rehabilitation Center, performed a neuropsychological evaluation of Plaintiff on February 1, 2010, to document Plaintiff's cognitive, intellectual, and emotional functioning, as well as to address possible school accommodations. Tr. 503-09. Dr. Showalter indicated that Plaintiff demonstrated a variable pattern of performance, including sub-optimal effort, which warranted a cautionary interpretation of the evaluation findings. Tr. 507. Specifically, he noted that her personality assessment yielded a profile of elevated clinical endorsement beyond that which would be considered

valid. Tr. 508. His suggested diagnoses included cognitive disorder, major depressive disorder, personality disorder, and rule/out posttraumatic stress disorder and dysthymic disorder. Tr. 508. He encouraged Plaintiff to obtain mental health treatment. Tr. 508. Dr. Showalter noted that Plaintiff was currently in college and had sought an evaluation for specific recommendations regarding school accommodations. Tr. 508. He suggested that she may need additional time to complete in-class tests or assignments. Tr. 508-09.

In a letter dated June 28, 2010, Steven W. Noles, Psy.D., a licensed clinical psychologist, informed Arlene Waller, M.D., at the Student Health Center of the University of Richmond, that he had reviewed Dr. Showalter's evaluation, and concluded Plaintiff had "significant limitations which [would] likely have an adverse effect on her ability to satisfy the university's foreign language requirement." Tr. 543. He wrote, "It is my clinical opinion that [Plaintiff] meets the criteria for a disability (substantial impairment in a major life function) in the area of processing speed. This pronounced weakness, in conjunction with her other demonstrated weaknesses (auditory learning, memory, attention and concentration, and cognitive flexibility even if not as weak as the data suggests), will likely negatively impact her ability to master a second language." Tr. at 543. Dr. Noles, therefore, endorsed a decision to grant Plaintiff a reasonable accommodation in the form of a course substitution for the university's foreign language requirement. Tr. 543.

Leslie E. Montgomery, Ph.D., and Stephen P. Saxby, Ph.D., state agency psychologists, reviewed the evidence and concluded, in 2009 and 2010, respectively, that Plaintiff's mental impairments would result in moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with others; complete a normal workday; and interact appropriately with the general public. Tr. 97-98, 472-73.

**B.    Hearing testimony**

At the hearing, Plaintiff testified that she lives with her mother and that she became her mother's primary caretaker after her mother suffered a massive stroke in 1995. Tr. at 52. Plaintiff is five foot ten inches tall and weighs approximately one-hundred and ninety pounds. Tr. at 52.

Plaintiff has a driver's license and access to a car, but she testified that she only drives once a month around the corner to the grocery store.  Tr. at 53.

Plaintiff suffers chronic daily pain from severe migraines, disc compression, and broken bones in her feet.  Tr. at 57.  Her arms and legs "go numb" from the MS lesion. Tr. at 57.  She has undergone steroid injections but they did not resolve her pain.  Plaintiff takes prescription pain medication "almost every day, but not every day." Tr. at 57.  She estimated that she takes pain medication fifteen to twenty time per week.  Tr. at 58.  She rated her daily pain as a six or seven on a scale of one to ten.  Tr. at 59.

Plaintiff appeared at the hearing in a wheelchair, prescribed by her treating family physician, Dr. Tunstall.  Tr. at 59. She testified that she was encouraged to use a wheelchair by "the osteo people – orthopedist" roughly six months before the hearing to facilitate healing in her feet, because "whatever keeps the weight off [her] feet as much as possible, because while [one foot] is healing, the other is still broken."  Tr. at 60.  Plaintiff also uses a motorized scooter prescribed by Dr. Tunstall.  Tr. at 61.

Plaintiff testified that she can safely lift and carry a maximum of one pound and can only stand a couple of minutes before she can no longer tolerate the pain.  Plaintiff further testified that sitting for any period of time also causes her pain so she "always ends up lying on [her] side." Tr. at 60. Plaintiff can walk about ten steps.  She suffers chronic insomnia and only sleeps four hours a night "if [she's] lucky."  Tr. at 62.

According to her hearing testimony, Plaintiff has shopped for her own groceries only a few times since her onset date.  Tr. at 62.  Plaintiff does not cook, her meals consist of "pre-prepared foods." Tr. at 62.  She does not do any house cleaning, except cleaning the toilets with pop-up wipes. Tr. at 62.  Plaintiff cannot care for herself without help from her mother.  Tr. at 64.  However, Plaintiff reported in her application for benefits that she cared for her mother.  Tr. 226. She was able to prepare simple meals and perform some housework, although she needed to rest when doing so. Tr. 255. She was able to shop for groceries in stores and online. Tr. 256. Reading was her only remaining hobby, but she was able to spend time with others several times per week. Tr. 257. She

reported no difficulty getting along with family, friends, or neighbors, although she said she felt sad, which was "not exactly fun" for other people. Tr. 258.

Plaintiff takes several medications, in addition to pain medication, to treat her various medical problems. Notably, Plaintiff has been giving herself interferon injections three times a week since 2007. Tr. at 73. She testified that her body "reject[s]" the injections, resulting in flu-like symptoms, which manifest four to eight hours after the injections. She further testified that it takes her several hours to get out of bed on a morning following an injection because "the joints [do not] want to move." Tr. at 74. Plaintiff testified that she experiences no relief from her MS symptoms as a result of the interferon injections. Tr. at 74.

When asked if she experiences side effects from her medication, she listed migraines (several times a day lasting a couple of hours), severe nausea, emotional and cognitive confusion, immobility, roving numbness, depression, suicidal ideation, blurred vision, brittle bones, dehydration, drowsiness, impaired motor skills, fatigue, hypersensitivity to light, hives, rashes, yeast infections, urinary tract infections, irritable bowel syndrome, dry eyes, blurred vision, bruising, insomnia, sleep disturbances, and tremors. Tr. at 64. Plaintiff has not undergone any physical therapy since her onset date, nor does she engage in any physical activity. Tr. at 65, 74.

Plaintiff testified that she is restricted from lifting, carrying, using knives, and there are certain foods she is not supposed to eat. Plaintiff further testified that she received psychiatric care until June of 2011, including therapy sessions she attended once per week, but she did not believe that the sessions helped her. Plaintiff was also prescribed medication to treat her mental illness, which sometimes helps her. Tr. at 66.

Plaintiff has fractured her left ankle, left foot, and right foot in two places, due to her inability to feel her extremities. Tr. at 72. She explained that the numbness she experiences is a symptom of her MS. Plaintiff further explained that her physician decided to wait until September to determine whether the fracture in her left foot healed, otherwise Plaintiff would require surgery to "fuse the bone back together in the ankle." Tr. at 72. Her right foot requires a similar surgery, however, her physician does not want to undertake the surgery until she has a stable left foot. Tr. at 73.

Plaintiff attended the University of Richmond from 2007 to 2009. Tr. at 68. Plaintiff testified that she had already been diagnosed with MS when she enrolled at the University. Tr. at 53. She received several accommodations based upon her medical condition. She testified that she nonetheless had great difficulty completing her degree. Tr. at 70. The University waived the foreign language requirement based upon the letter from Dr. Noles, and Plaintiff was permitted additional time to complete assignments. She was given class notes, due to her inability to "write fast." Tr. at 71.

Nevertheless, according to Plaintiff's transcript from the University, she graduated *magna cum laude* with a Bachelor of Arts degree in English and American Studies. Tr. at 345. Although she attended college, Plaintiff did not undergo any vocational training after she was laid off from her personnel position at the Federal Reserve Bank. She had past work experience as a senior human resources analyst, most recently from 1997 to 2002. Tr. 226. She was responsible for database design and implementation and advised managers on employment issues and disciplinary actions. Tr. 227.

### C.     The ALJ's decision

In reaching his conclusion that Plaintiff was capable of performing sedentary work, the ALJ relied upon Plaintiff's activities of daily living and conservative course of pain management. The ALJ cited a third-party function report dated February 9, 2009 and completed by Plaintiff's mother. In the report, Plaintiff's mother described Plaintiff as her full-time care giver. Tr. at 263-274. She reported that Plaintiff prepared meals, ran errands, shopped for groceries, and cared for her mother's medical needs and hygiene. The ALJ further relied upon Plaintiff's ability to attend and graduate from the University with honors, as well as tutor other students, during the years following her MS diagnosis. Finally, although the ALJ recognized that Plaintiff suffered from ongoing pain as a result of her various physical problems, he relied upon her conservative treatment to conclude that her pain was not as severe as she described at the hearing.

### D.     Plaintiff's arguments

Plaintiff contends that there is not substantial evidence in the record to support the ALJ's conclusion that she is capable of performing a full range of sedentary work, including her past work. Plaintiff relies on the medical evidence in the record, the ALJ's reliance on the fact that the ALJ did

not recognize Dr. Noles as a one-time examining physician, and her own testimony, to demonstrate that she is not capable of performing full-time work.

First, it is important to note that Plaintiff's treating physician, Dr. Tunstall concluded that Plaintiff had no restrictions in lifting; could stand and/or walk for fifteen to twenty minutes without interruption and for a total of one hour in an eight-hour day; and could sit for two hours without interruption and for a total of eight hours. Tr. 567-68. Although the form is undated, it demonstrates nonetheless that Plaintiff's treating physician opined that Plaintiff was capable of sedentary work.

Next, the ALJ gave specific weight to the opinion evidence in the record. The ALJ gave limited weight to the opinion of Dr. Tunstall (particularly in regard to restrictions on standing and walking or performing postural maneuvers) because it was " not supported by her objective findings or by the findings of examining neurologists and orthopedists, and because it was not consistent with [Plaintiff's] admitted activities of daily living and her ability to graduate from college and serve as her mother's caregiver." Tr. at 36. The ALJ gave no weight to the opinions of the state agency mental assessments because Drs. Dougherty and Showalter both noted Plaintiff's variable effort and credibility. He further concluded that their opinions were contradicted by substantial evidence in the record, that is, Plaintiff's ability to attend and graduate with honors from the University and care for her mother since her alleged onset of disability. Tr. at 36.

Turning to Plaintiff's argument regarding the weight given to the opinion of Dr. Noles, the evidence in the record does not establish that Dr. Noles is a one-time examining physician. Dr. Noles letter indicates that he only reviewed the Woodrow Wilson Rehabilitation Center report. In fact, the evidence attached to Plaintiff's brief, a "To Whom It May Concern" letter from Mary Churchill, Ph.D., ECF Dkt .#10-1, merely establishes that Dr. Noles "met" with Plaintiff. Moreover, the weight given to Dr. Noles' opinion is harmless error, insofar as Dr. Noles simply concluded that Plaintiff should be excused from the foreign language requirement. This conclusion in no way contravenes the ALJ's decision that Plaintiff is capable of performing sedentary work.

Finally, when a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of

the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p.  *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors.  *Felisky*, 35 F.3d at 1039-40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination.  *See Casey*, 987 F.2d at 1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence.  *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ found that Plaintiff's impairments could be expected to produce pain and symptoms but not the kind of debilitating pain and symptoms that Plaintiff alleged.  It should be noted that the ALJ did not totally reject Plaintiff's allegations, but rather, he determined that Plaintiff's allegations of the intensity, duration and limiting effects of his symptoms were not substantiated by the objective medical findings or other evidence in the record.

An ALJ is not required to accept a plaintiff's own testimony regarding her pain.  *See Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir. 1987).  Although Plaintiff testified that she suffers debilitating pain, the ALJ correctly observed that Plaintiff's activities of daily living belie her testimony.  Plaintiff attended college following her alleged disability date and cared for her mother.  Furthermore, both of the consultative mental examinations in the record questioned Plaintiff's credibility with respect to her previous substance abuse and exaggeration of her symptoms and pain.  For instance, Dr. Showalter opined that Plaintiff's personality assessment yielded a profile of elevated clinical endorsement beyond that which would be considered valid.  Tr. at 508.  Accordingly, the ALJ did not err in refusing to credit Plaintiff's testimony regarding her pain.

In summary, the ALJ did not err in concluding that there exists substantial evidence in the record to support the conclusion that Plaintiff is capable of performing sedentary work, including

her past work as a human resources analyst. Plaintiff underwent conservative treatment for her MS, and her symptoms and the side effects of her medication did not prevent her from attending the University on a full-time basis and caring for her mother. Although she claimed to suffer from diminished sight, the record reflects that her problem was resolved with corrective lenses. Tr. at 363. She underwent conservative treatment for her back pain due to osteoarthritis and degenerative disc disease. Tr. at 437-438. In fact, Plaintiff's neurologist advised against lumbar fusion surgery until she could no longer tolerate the pain associated with her back problems. However, based upon Plaintiff's activities of daily living and pain level, Dr. Mathern concluded that surgery was not necessary. Tr. at 433-434. laintiff testified that she is unable to stand for a more than a few minutes or walk more than five steps. Tr. at 59-60. However, her testimony is contravened by medical evidence that she had full strength in her extremities, Tr. at 432-434, 441. Similarly, Plaintiff testified that she cannot lift or carry more than a pound at a time. Tr. at 59. Her testimony is at odds with medical evidence that she had full strength in her upper extremities. Tr. at 432-434. Accordingly, substantial evidence supports the decision of the ALJ.

### VI. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint with prejudice.

DATE: April 11, 2014

                                       */s/George J. Limbert*
                                       GEORGE J. LIMBERT
                                       UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).